David A. Bahr (D.D.C. Bar # OR0001)
BAHR LAW OFFICES, P.C.
1035 1/2 Monroe Street
Eugene, OR  97402
(541) 556-6439
davebahr@mindspring.com

Talasi Brooks (ID Bar #9712)
*Pro Hac Vice application to be submitted*
Western Watersheds Project
P.O. Box 2863
Boise ID 83701
(208) 336-9077
tbrooks@westernwatersheds.org

*Attorneys for Plaintiff*

**UNITED STATES DISTRICT COURT
DISTRICT OF THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| WESTERN WATERSHEDS PROJECT<br>126 S Main St., Suite B<br>P.O. Box 1770<br>Hailey, ID 83333,<br>       Plaintiff,<br><br>v.<br><br>DEB HAALAND, in her capacity as Secretary<br>of the Interior,<br>U.S. Department of the Interior<br>1849 C Street, N.W.<br>Washington, DC 20240;<br><br>U.S. FISH AND WILDLIFE SERVICE<br>1849 C Street, N.W.<br>Washington, DC 20240;<br><br>BUREAU OF LAND MANAGEMENT<br>1849 C. Street, N.W., #5665<br>Washington, DC 20240;<br><br>NATIONAL PARK SERVICE<br>1849 C Street, N.W.<br>Washington, DC 20240; | Case No.: 23-2684<br><br>**COMPLAINT FOR DECLARATORY<br>AND INJUNCTIVE RELIEF** |

TOM VILSACK, in his capacity as Secretary
of Agriculture,
1400 Independence Ave., SW
Washington D.C. 20250;

U.S. FOREST SERVICE,
Sidney R. Yates Federal Building,
201 14th St. SW
Washington D.C. 20227; and

CLARK COUNTY, NEVADA,
500 S. Grand Central Pkwy, 2nd Floor
Box 551510
Las Vegas, NV 89155-1510;

                    Defendants.

## INTRODUCTION

1.      The Mojave desert tortoise (*Gopherus agassizii*), listed in 1990 as Threatened

under the Endangered Species Act ("ESA"), has declined dramatically in nearly all of its range

due to threats including degradation and destruction of its habitat by livestock grazing and

human development. In 2001, in order to protect the desert tortoise, along with 77 other species,

while also allowing for development of non-federal lands surrounding the city of Las Vegas

without incurring liability for unlawful "take" under the Endangered Species Act (ESA), Clark

County, Nevada, along with other signatories, adopted the Clark County Multi-Species Habitat

Conservation Plan ("MSHCP").

2.      To assess the environmental impacts of the MSHCP, including whether the "take"

of listed and imperiled species it contemplated would cause jeopardy to the desert tortoise and

other species, Clark County and the U.S. Fish and Wildlife Service ("FWS") prepared an

Environmental Impact Statement ("EIS") under the National Environmental Policy Act

("NEPA") and the FWS issued a Biological Opinion ("BiOp").  Although the BiOp recognized that "[t]he cumulative amount of human and disease-related mortality accompanied by habitat destruction, degradation, and fragmentation is the most serious threat facing the desert tortoise," the BiOp concluded that the authorized take would not jeopardize the continued existence of the species.  Thus, the FWS issued an Incidental Take Permit ("ITP") to Clark County.

3.      The ITP allows for "take" of the Mojave desert tortoise and other species and their habitats from development of 145,000 acres of non-federal lands (later expanded to 167,650 acres) so long as specific conservation measures set forth in the MSHCP, BiOp, and ITP are implemented on federal lands administered by the Forest Service, Bureau of Land Management ("Bureau"), and National Park Service ("NPS"). Those nondiscretionary conservation measures include closing nearly all of the planning area to livestock grazing, including the Gold Butte Area of Critical Environmental Concern ("ACEC") of Gold Butte National Monument—as required by the Las Vegas Resource Management Plan ("RMP"). After considering threats to the species from actions on federal lands, the MSHCP, BiOp, and ITP concluded that federal lands will serve as species habitat, allow for habitat connectivity, and act as a buffer for lands with more intensive use.

4.      The Forest Service, the Bureau, NPS, and Fish and Wildlife Service all signed an Implementing Agreement ("IA"), which binds them to implement the MSHCP.

5.      Yet, two decades later, the promised closure of the Gold Butte ACEC to grazing has not been carried out.  Cattle continue to graze illegally throughout the ACEC, causing irreversible damage to ecological values.  The Bureau has not rounded up and removed these cattle, even though it is aware they are compromising the lands' habitat values, and the lands are closed to grazing under the MSHCP, as well as the Las Vegas RMP.

6. In addition, vast swaths of the federal lands previously intended to serve as wildlife habitat are now either proposed or approved for large-scale solar development— an activity not contemplated by the MSHCP, EIS, or BiOp— which eliminates or reduces their value as habitat for the desert tortoise. For example, the Bureau has recently approved at least four large solar developments spanning more than 13,000 acres within lands covered or partially covered by the MSHCP. The MSHCP (and supporting EIS) did not consider the threats to the desert tortoise and other wildlife, from solar development.

7. Where such significant modification of management actions occurs, the IA provides that agencies must consider the effects of those changes on the habitats and species covered by the MSHCP. The agencies have not done so.

8. Meanwhile, desert tortoise populations have plummeted since 2001 and the species is in long-term decline. Populations in all recovery units except for the Northeast Mojave Recovery Unit declined drastically from 2004 to 2014, and the species' range wide abundance fell by 32 percent during just that ten-year period. By 2014, three of the five Recovery Units fell below the minimum viable population density threshold necessary to avoid extinction.

9. Since 2014, the species has continued to decline, especially in the West Mojave Recovery Unit, due in large part to habitat destruction from large-scale solar projects. As a result, the Desert Tortoise Council now believes that the Mojave desert tortoise meets the ESA's definition of an endangered species. Upon information and belief, other species covered by the MSHCP have also experienced changes in status since the MSHCP BiOp issued.

10. Defendants are violating the ESA by failing to ensure that the BiOp's mandatory terms and conditions barring grazing within the Gold Butte ACEC are carried out, and by ignoring trespass grazing that causes unauthorized take of the desert tortoise and other covered

species. In light of these violations, as well as the new and unanticipated threat from large-scale solar development, and the declines of the desert tortoise and other species covered by the MSHCP, Defendants must immediately reinitiate consultation under the ESA to fulfill their duty to ensure that the authorized development does not jeopardize the desert tortoise or other covered species.

11.     In addition, both the continuation of unauthorized grazing and the onslaught of solar developments require supplemental NEPA analysis since they are impacts to the tortoise that were not considered or contemplated in the MSHCP EIS.

12.     Western Watersheds Project seeks an order from the Court vacating the BiOp and ITP, ordering the agencies to immediately reinitiate ESA consultation over the MSHCP and ITP, ordering Defendants to immediately supplement the MSHCP's EIS, enjoining the Defendants from authorizing or carrying out any further development on covered lands until a lawful ESA consultation is in place and a lawful supplemental NEPA analysis completed, and granting such additional relief as the parties may request or Court may deem appropriate.

## JURISDICTION AND VENUE

13.     This Court has jurisdiction over the ESA claims in this action pursuant to the citizen suit provision of the ESA. 16 U.S.C. §§ 1540(g). The Court also has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1346, because this action involves the United States as a defendant and arises under the laws of the United States, including the ESA, 16 U.S.C. § 1531 *et seq.*, the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq.*, and the National Environmental Policy Act ("NEPA"), 42 U.S.C. § 4231 *et seq.*  The requested relief is proper under 16 U.S.C. § 1540(g)(1); 28 U.S.C. §§ 2201, 2202, 1361; and 5 U.S.C. §§ 704-706.

14. WWP gave notice to Defendants of WWP's intent to file suit under the ESA for the ESA violations described in the notice and this complaint more than 60 days ago. 16 U.S.C. § 1540(g)(2)(C). Specifically, WWP notified Defendants of WWP's intent to file suit under the ESA on or around December 1, 2022 and June 2, 2023.

15. The violations complained of in the notice have not been remedied.

16. The Defendants' actions (or inactions) are ripe for review.

17. WWP has standing to bring these claims.

18. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e) because Secretary Haaland, Secretary Vilsack, and the federal agency Defendants sued here reside in this District.


**PARTIES**

19. Plaintiff WESTERN WATERSHEDS PROJECT (WWP) is a nonprofit membership organization with over 14,000 members and supporters and is dedicated to protecting and conserving the public lands and natural resources of watersheds in the American West. WWP, as an organization and on behalf of its members, is concerned with and active in seeking to protect imperiled wildlife, including the desert tortoise, as well as natural resources, and ecological values of watersheds throughout the West and in Nevada. WWP is particularly active in addressing ecological damage caused by livestock grazing, such as the damage presently occurring within the Gold Butte ACEC and Gold Butte National Monument. WWP is headquartered in Hailey, Idaho, and has additional staff and offices in other Western states, including in Nevada.

20. WWP's staff, members, and supporters are deeply concerned about the biodiversity crisis and value preservation of native wildlife. WWP's staff, members, and

supporters have strong interests in ensuring that adequate protections are in place for native wildlife, including the desert tortoise, when development that adversely affects native wildlife and their habitats is proposed. WWP's staff, members, and supporters also have strong interests in using and enjoying public lands free from damage caused by livestock and in recovery of those lands from damage caused by livestock—especially because that recovery improves their value as habitat for the desert tortoise and other species. WWP's staff, members, and supporters' enjoyment of public lands is increased when those lands are free from industrial development and land uses that harm native wildlife. WWP's staff, members, and supporters have strong interests in ensuring robust adherence to, and enforcement of, federal laws intended to protect wildlife and the environment.

21.    WWP's staff, members, and supporters live and recreate in or near Clark County, and enjoy recreating within the Gold Butte ACEC and Gold Butte National Monument, as well as other MSHCP lands. WWP's members and supporters engage in activities including hiking, camping, photography, observing wildlife, and other pursuits for health, recreational, scientific, spiritual, educational, aesthetic, professional, and other purposes. They enjoy observing, attempting to observe, photographing, and studying wildlife, including the desert tortoise, and look for signs of imperiled species' presence when they are undertaking these activities on federal lands covered by the MSHCP. The opportunity to view wildlife like the desert tortoise or their sign is of significant interest and value to WWP's members and supporters, and it increases their use and enjoyment of public lands and ecosystems in Nevada. WWP's members and supporters have regularly engaged in these activities in the past, and they intend to continue to regularly do so in the upcoming months.

22.     The interests of WWP's members and supporters have been, and will continue to be, adversely affected and aggrieved by the Defendant agencies' failure to comply with the ESA and its implementing regulations. By failing to carry out the terms of the MSHCP, BiOp, and ITP, Defendant agencies risk placing the desert tortoise and other species in jeopardy. This, in turn, injures WWP's interests in enjoying opportunities to view and study the desert tortoise in its native habitats, and in preserving biodiversity. Defendant the Bureau's failure to carry out the terms of the MSHCP, BiOp and ITP also injures WWP's interests in enjoying public lands within the Gold Butte ACEC and/or Gold Butte National Monument, free from degradation caused by livestock.  These are actual, concrete, and particularized injuries caused by Defendants' violations of law.

23.     Defendants' failure to reinitiate consultation in light of the new threat from large-scale solar development, desert tortoise population decline, and the Bureau's non-adherence to the BiOp terms and conditions, violates the ESA and risks placing the desert tortoise and other species in jeopardy. The increased risk of extinction to these species harms WWP's staff, members, and supporters by decreasing their ability to enjoy the species in the wild and harms their interests in averting the crisis of biodiversity loss. These, too, are actual, concrete, and particularized injuries caused by Defendants' violations of law.

24.     In addition, the Bureau's authorization of numerous solar developments on public lands intended to serve as habitats for the desert tortoise by the MSHCP—without having considered the effect of those developments in the MSHCP EIS—harms WWP's interests. WWP has strong interests in ensuring federal actions are well-considered, especially when they risk to harm already-imperiled species. WWP also has strong interests in having federal actions comply with environmental laws and regulations.

25.     The relief WWP seeks in this Complaint would redress its injuries and those of their members and supporters. The relief WWP requests, if granted, would prevent further destruction of desert tortoise and other species' habitats on lands subject to the MSHCP until Defendants produce a legally-valid biological opinion. Requiring Defendants to reinitiate consultation and/or supplement the MSHCP EIS would ensure that Defendants were acting with accurate and complete information about the effects of development on the desert tortoise and other MSHCP species.  If Defendants reinitiated consultation, the FWS might impose additional terms and conditions to preserve federal lands from large-scale solar development, livestock grazing, or other actions that reduce their value as habitat for the desert tortoise and other wildlife.  If Defendants supplemented the MSHCP EIS to consider the effects of solar developments on desert tortoise, they might adopt additional protections for the desert tortoise or otherwise alter their actions in ways that would protect WWP's interests in the conservation and recovery of the desert tortoise, other imperiled species, and the environment.  In particular, FWS might require the Bureau to round up cattle grazing in trespass within the Gold Butte ACEC and/or Gold Butte National Monument to fulfill its nondiscretionary MSHCP obligation to protect the desert tortoise.  Ultimately, requiring Defendants to reinitiate consultation and/or supplement the MSHCP EIS could result in more robust and effective protections for the desert tortoise and other species covered by the MSHCP, which, in turn, could help promote their long-term persistence and the ability of WWP's staff, members, and supporters, to enjoy these species within Clark County.

26.     In sum, WWP's interests, and those of its members and supporters, have been, are being, and—unless this Court grants the requested relief—will continue to be harmed by Defendants' actions and inactions challenged in this Complaint. WWP has been required to

expend costs and to obtain the services of attorneys to prosecute this action seeking redress for its injuries.  If this Court issues some or all of the relief requested, the harm to WWP's interests, and those of its members and supporters, will be redressed.

27.    Defendant DEB HAALAND is the Secretary of the Interior, and is the federal official in whom the ESA vests final responsibility for making decisions required by and in accordance with the ESA. She is also ultimately responsible for actions and decisions of Defendants the Bureau of Land Management and the National Park Service. Secretary Haaland is sued in her official capacity.

28.    Defendant the U.S. FISH AND WILDLIFE SERVICE ("FWS") is a federal agency within the Department of Interior charged with implementing and ensuring compliance with the ESA. The Secretary of the Interior has delegated administration of the ESA to the FWS. 50 C.F.R. § 402.01(b). The FWS was a preparer of the MSHCP EIS and prepared the MSHCP BiOp.

29.    Defendant BUREAU OF LAND MANAGEMENT ("the Bureau") is an agency of the United States charged with managing certain federal lands in Nevada—including some lands affected by the MSHCP —according to federal statutes and regulations, including the ESA. The Bureau manages livestock grazing on federal lands covered by the MSHCP, including within Gold Butte National Monument. The Bureau is a signatory to the MSHCP IA, which binds it to implement the MSHCP.  Implementation of the MSHCP is also a mandatory requirement of the BiOp.

30.    Defendant the NATIONAL PARK SERVICE (NPS) is an agency of the United States charged with managing certain federal lands in Nevada—including some lands affected by the MSHCP— according to federal statutes and regulations, including the ESA. NPS is a

signatory to the MSHCP IA, which binds it to implement the MSHCP.  Implementation of the

MSHCP is also a mandatory requirement of the BiOp.

31.     Defendant TOM VILSACK is the Secretary of Agriculture, and is ultimately

responsible for actions and decisions of Defendant the Forest Service. He is sued in his official

capacity.

32.     Defendant U.S. FOREST SERVICE (Forest Service) is an agency of the United

States charged with managing certain federal lands in Nevada—including some lands affected by

the MSHCP— according to federal statutes and regulations, including the ESA. The Forest

Service is a signatory to the MSHCP IA, which binds it to implement the MSHCP.

Implementation of the MSHCP is also a mandatory requirement of the BiOp.

33.     Defendant CLARK COUNTY is a county of the State of Nevada. Clark County is

a signatory to the MSHCP IA, which binds it to implement the MSHCP.  Implementation of the

MSHCP is also a mandatory requirement of the BiOp.  Clark County is one of several entities

that hold the ITP. Clark County was a preparer of the MSHCP EIS.


## LEGAL FRAMEWORK

### I.  The Endangered Species Act

34.     Enacted in 1973, the ESA is "the most comprehensive legislation for the

preservation of endangered species ever enacted by any nation." *Tenn. Valley Auth. v. Hill*, 437

U.S. 153, 180 (1978). It provides a means to conserve endangered and threatened species and the

ecosystems on which they depend. 16 U.S.C. § 1531(b).

35.     To receive the full protections of the ESA, a species must first be listed by the

Secretary of the Interior as "endangered" or "threatened." 16 U.S.C. § 1533. The ESA defines an

"endangered species" as "any species which is in danger of extinction throughout all or a significant portion of its range." *Id.* § 1532(6). A "threatened" species is "any species which is likely to become an endangered species within the foreseeable future throughout all or a significant portion of its range." *Id.* § 1532(20).

36.     Concurrent with listing a species, the ESA requires the designation of critical habitat. 16 U.S.C. § 1533(a)(3)(A)(i); *see also id.* § 1533(b)(6)(C). Critical habitat means "the specific areas within the geographical area occupied by the species . . . on which are found those physical or biological features (I) *essential* to the conservation of the species and (II) which may require special management considerations or protection;" and unoccupied areas "*essential* for the conservation of the species." *Id.* § 1532(5) (emphasis added). "Conservation" is defined as all methods that can be employed to "bring any endangered species or threatened species to the point at which the measures provided pursuant to this [Act] are no longer necessary." *Id.* § 1532(3).

37.     The ESA a prohibits "take" of a listed species. *Id.* § 1538(a)(1).  Take includes harassing, harming, wounding, killing, trapping, capturing, or collecting a listed species.  *Id.* § 1532(19).

38.     The FWS defines harm as "an act which actually kills or injures wildlife…[and] may include significant habitat modification or degradation where it actually kills or injures wildlife by significantly impairing essential behavioral patterns, including breeding, feeding or sheltering." 50 C.F.R. § 17.3.  "Harass" means "means an intentional or negligent act or omission which creates the likelihood of injury to wildlife by annoying it to such an extent as to significantly disrupt normal behavioral patterns which include, but are not limited to, breeding, feeding, or sheltering."  *Id.*

39.     However, the Secretary of the Interior may issue a permit to allow otherwise-forbidden take, if the taking is "incidental" to an otherwise lawful activity and the permit applicant develops a habitat conservation plan for the affected species that sets forth the impacts of the take, how the applicant will minimize and mitigate take, and which alternatives the applicant considered, among other things.  16 U.S.C. § 1539(a)(2)(A).

40.     In that case, the Secretary may issue an "incidental take permit" allowing for take of the affected species if the Secretary finds that 1) the take will be incidental to the activity, 2) the applicant will minimize the amount of taking, 3) the conservation plan is adequately funded, 4) the taking will not reduce the species' likelihood of survival and recovery in the wild, and 5) any other measures imposed by the Secretary will be met.  *Id.* § 1539(a)(2)(B).

41.     When approving actions that "may affect" affect listed species or their critical habitat, such as the grant of an incidental take permit, federal agencies must consult with the expert agency—here the FWS—to ensure the actions do not jeopardize the species' continued existence or adversely modify their critical habitat. *Id.* § 1536(a)(2); 50 C.F.R. § 402.14(a).  For actions that "may affect" listed species or their critical habitat, FWS must provide the action agency with a "biological opinion" (BiOp) explaining how the proposed action will affect the listed species or habitat.  16 U.S.C. § 1536(b); 50 C.F.R. § 402.14. The BiOp must include "a detailed discussion of the effects of the action on listed species or critical habitat." 50 C.F.R. § 402.14(h)(1)(ii). The FWS can only issue an ITP it finds in the BiOp that the proposed action is not likely to jeopardize the continued existence of listed species.

42.     If conservation and management measures provided for in a habitat conservation plan and ITP fall short, then the conclusions in the BiOp are invalid, consultation must be reinitiated and the ITP must be suspended or revoked. *See* 16 U.S.C. § 1539(a)(2)(C); 50 C.F.R.

§§13.27 ("may be suspended at any time if the permittee is not in compliance with the conditions of the permit"), 13.28 (permit revocation).

43.     After the procedural requirements of consultation are complete, the ultimate duty to ensure that an activity does not jeopardize a listed species lies with the action agency. An action agency's reliance on an inadequate, incomplete, or flawed BiOp to satisfy its ESA section 7 duty is arbitrary and capricious.  In addition, an agency must reinitiate consultation with the FWS if the projected amount of incidental take is exceeded or if : "new information reveals effects of the action that may affect listed species or critical habitat in a manner or to an extent not previously considered;" "the identified action is subsequently modified in a manner that causes an effect to the listed species or critical habitat that was not considered in the biological opinion or written concurrence;" or "a new species is listed or critical habitat designated that may be affected by the identified action." 50 C.F.R. §§ 402.14(i)(4), 402.16(a).


## II. The National Environmental Policy Act

44.     In reviewing an ITP application, the FWS must comply with the National Environmental Policy Act (NEPA).

45.     NEPA is our "basic national charter for protection of the environment." 40 C.F.R. § 1500.1(a). NEPA's twin aims are (1) to ensure that agencies consider every significant aspect of the environmental impact of a proposed action and (2) to inform the public that the agency has considered environmental concerns in its decision-making process.

46.     Under NEPA, a federal agency must prepare an Environmental Impact Statement ("EIS") for all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). The EIS must disclose and analyze the "environmental

impacts of the proposed action and reasonable alternatives to the proposed action and the

significance of those impacts." 40 C.F.R. § 1502.16(a)(1). To determine whether an EIS is

required an agency may first prepare an Environmental Assessment ("EA").

47.     Moreover, NEPA requires federal agencies, whether in an EA or an EIS, to take a

"hard look" at the potential environmental consequences of a proposed action.  To take the

required hard loo' at the proposed project's effect, an agency may not rely on incorrect

assumptions or data in its NEPA analysis.

48.     An agency's responsibility to comply with NEPA does not end once it has

completed its NEPA analysis. An agency must prepare a supplemental NEPA analysis if either

"[t]he agency makes substantial changes to the proposed action that are relevant to

environmental concerns" or "[t]here are significant new circumstances or information relevant to

environmental concerns and bearing on the proposed action or its impacts."  40 C.F.R. §

1502.9(d)(1). If there remains a "major Federal action to occur, and if the new information is

sufficient to show that the remaining action will affect the quality of the human environment in a

significant manner or to a significant extent not already considered, a supplemental [NEPA

analysis] must be prepared." *Marsh v. Oregon Nat. Res. Council*, 490 U.S. 360, 374 (1989).


**III. The Administrative Procedure Act.**

49.     Because NEPA does not contain internal standards of review, the Administrative

Procedure Act ("APA") governs judicial review. Under the APA, courts shall "hold unlawful and

set aside agency action, findings, and conclusions found to be arbitrary, capricious, an abuse of

discretion, or otherwise not in accordance with law" or "without observance of procedure

required by law." 5 U.S.C. § 706(2)(A), (D).

50.     In addition, the APA authorizes reviewing courts to "compel agency action unlawfully withheld or unreasonably delayed," such as the reinitiation of ESA consultation and supplemental NEPA analysis at issue here. *Id.* § 706(1). Courts must also reverse and set aside agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." *Id.* § 706(2)(C).

## STATEMENT OF FACTS

51.     The Mojave desert tortoise (*Gopherus agassizii*) is a large tortoise species that inhabits creosote-burro bush or creosote-Joshua tree vegetation types. It is long-lived and reproduces slowly; tortoises do not reach sexual maturity until they are 10 to 15 years old.  63 Fed. Reg. 12178, 12179 (Apr. 2, 1990).  Tortoises spend as much as 95 percent of their time in burrows, which they rely on for shelter against the desert's extreme climate.

52.     Human activity is the most significant source of tortoise mortality.

53.     Construction projects such as roads, housing developments, energy developments and conversion of native habitats to agriculture have destroyed habitat supporting tortoises in the Mojave population of desert tortoise, while grazing and off-road-vehicle use have degraded additional habitat.

54.     The Mojave desert tortoise was initially listed under the ESA in 1989 on an emergency basis after an upper respiratory disease caused significant declines to tortoise subpopulations already stressed by habitat degradation, predation, and other factors.  *See* 63 Fed. Reg. 12178, 12179 (Apr. 2, 1990).

55.     The City of Las Vegas and the State of Nevada unsuccessfully challenged the emergency listing in the U.S. District Court for the District of Columbia. *City of Las Vegas v. Lujan*, 891 F.2d 927 (D.C. Cir. 1989).

56.     After the emergency listing expired, the Mojave desert tortoise population was listed as Threatened in 1990. 63 Fed. Reg. 12178 (Apr. 2, 1990).

57.     Clark County and other entities could not lawfully carry out actions that would cause "take" of the desert tortoise, including development on non-federal lands, once the species was listed.

58.     Thus, after the Mojave desert tortoise received Threatened status, Clark County quickly adopted a "short term Habitat Conservation Plan" and supporting Environmental Assessment (EA) for the desert tortoise to allow projects in urbanized portions of the county to move forward while a longer term habitat conservation plan was in the process of being finalized.  The short-term habitat conservation plan contemplated development of 22,352 acres, projecting to take 1,788 to 3,710 tortoises.  Based on that plan, the County received an Incidental Take Permit ("ITP") in 1991.

59.     The longer-term Habitat Conservation Plan and ITP were completed—with a supporting Environmental Impact Statement ("EIS")—in 1995.  The 1995 Desert Tortoise Habitat Conservation Plan allowed for development of 111,000 acres of non-federal land in Clark County and of 2,900 acres associated with Nevada Department of Transportation activities in Clark, Lincoln, Esmeralda, Mineral, and Nye Counties, so long as conservation measures, including closing certain lands to grazing, were carried out.

60.     In 2000, Clark County, the other Defendants, and other entities adopted the MSHCP.  The MSHCP allowed for development of 145,000 acres of non-federal lands that would take desert tortoise and 77 other covered species.

61.     The 145,000 acres included lands anticipated to be "disposed of" by the Bureau by transferring them to the County.

62.     At the time the MSHCP was adopted, 175,000 acres of the Bureau's lands subject to disposal existed.

63.     Not all such lands subject to disposal have been transferred to the County.

64.     Upon information and belief, the Bureau intends to transfer additional lands to the County.

65.     Based on the MSHCP, the FWS issued an ITP to Clark County, the City of Las Vegas, the City of North Las Vegas, the City of Henderson, the City of Boulder City, the City of Mesquite, and the Nevada Department of Transportation in 2001.

66.     The 2001 ITP supersedes the 1995 ITP.

67.     The 1995 ITP is no longer valid.

68.     Defendants, along with various other entities, all signed an "Implementing Agreement" (IA), which binds them to implement the MSHCP. The ITP terms and conditions specify that the take authorization granted is subject to compliance with, and implementation of, the MSHCP and IA. The ITP is also supported by a BiOp and an Environmental Impact Statement (EIS).

69.     The MSHCP, EIS, ITP, IA, and BiOp are analyzed and approved as a complete package.

70.     Although the 2001 ITP was intended to remain in effect for 30 years, by 2007, more than 45 percent of the authorized take (measured in terms of development on private lands in Clark County) had already occurred. The FWS formally proposed an amendment to the MSHCP in 2009, but that process was never completed. *See* 74 Fed. Reg. 50239 (Sept. 30, 2009). An additional 22,650 acres of take authorization were added to the permit by legislative amendment in 2014, bringing the total take authorization to 167,650 acres. As of February 2019, the MSHCP permittees had developed 103,494 of the 167,650 acres. Upon information and belief, additional acres have been developed since then.

71.     The MSHCP is still in effect on the date this Complaint is filed.

72.     The MSHCP requires specific conservation measures to be implemented on federal lands, including those administered by the Forest Service, the Bureau, and NPS to conserve the covered species by compensating for take caused by development and other activities on non-federal lands. The MSHCP sets forth specific actions each agency must undertake.

73.     For example, the MSHCP provides that the Bureau will ensure that grazing systems are consistent with the conservation of Bureau-designated special status species, provide adequate law enforcement presence to ensure that management actions and restrictions are implemented for the conservation of covered and/or evaluation species, designate the Gold Butte desert tortoise critical habitat as an Area of Critical Environmental Concern ("ACEC"), and close all allotments to livestock grazing, within the planning unit except for Hidden Valley, Mount Stirling, Lower Mormon Mesa, Roach Lake, White Basin, Muddy River, Wheeler Wash, Mesa Cliff, Arrow Canyon in Battleship Wash, Flat Top Mesa, Jean Lake, and Arizona administered allotments.

74.     The MSHCP requires the Bureau to keep the Gold Butte ACEC—encompassing the former "Gold Butte Allotment"— closed to livestock grazing.[1]

75.     In addition, Clark County committed to purchase additional grazing privileges on Bureau-managed lands so that they could be closed to grazing and used for conservation.

76.     The MSHCP requires that FWS assure full and continuing implementation of existing management policies and actions, and monitoring of sensitive habitats and species. FWS must also prohibit horses, burros, and livestock grazing.

77.     All of the conservation and management measures in the MSHCP are incorporated as mandatory terms and conditions of the BiOp:

> All of the conservation and management measures in the MSHCP and accompanying agreements, together with the terms identified in the associated IA and the special permit terms and conditions, are hereby incorporated by reference as reasonable and prudent measures, and terms and conditions for this incidental take statement pursuant to 50 CFR 402.14(1). Such terms and conditions are non-discretionary and must be undertaken by the Applicants for the exemptions under section 10(a)(l)(B) and section 7(o)(2) of the Act to apply. If the Applicants fails to adhere to these terms and conditions, the protective coverage of the Permit and section 7(o)(2) may lapse.

BiOp 8.7-8.8.

78.     The BiOp and MSHCP assume that federal lands, even those managed for multiple-use, will serve as species habitat, allow for habitat connectivity, and act as a buffer for areas with more intensive use.

79.     The MSHCP divides the landscape into four categories: Intensively managed areas ("IMAs"), Less intensively managed areas ("LIMAs"), Multiple use managed areas ("MUMAs"), and Unmanaged areas ("UMAs"). IMAs are lands in which management is oriented toward actions that reduce or eliminate potential threats to biological resources, such as

---

[1] All of most of the Gold Butte ACEC was later designated as Gold Butte National Monument by former President Obama.

wilderness areas, biodiversity hotspots, wilderness study areas, or the conserved/critical habitat areas established for the Mojave Desert tortoise.  LIMAs are lands on which management generally limits the range of uses allowed to primarily low-impact recreational uses and include Bureau lands managed as National Conservation Areas. MUMAs are defined as undesignated Bureau lands on which human activities are not precluded and may, at times, be intense but which nevertheless continue to support significant areas of undisturbed natural vegetation. UMAs are intensively developed areas such as landfills, mines, and others.

80.     The MSHCP assumes that the IMAs and LIMAs serve as a "reserve system" in Clark County.  It also assumes that MUMAs provide conservation value as corridors, connections, and buffers for the IMAs and LIMAs where management preserves the habitat quality sufficient to allow for unimpeded use and migration of species that reside in the IMAs and LIMAs.  Its overarching goal is to allow no net unmitigated loss or fragmentation of habitat in IMAs and LIMAs (or MUMAs where they represent the majority of habitat for the species).

81.     The IA protects these classifications.  It provides that "the Parties agree that in the event of any…modification of management actions or activities permitted within [IMAs, LIMAs, or MUMAs] which are significantly different from those set forth in the MSHCP, substantial adverse impacts upon habitats and Covered Species could occur…[and such changes which have] an adverse impact upon the likelihood of the survival and recovery of the species in the wild may be grounds for the suspension, termination, or revocation [of the MSHCP]…." IA § 9.03, pp. 14-15.

82.     Signatories (including the Bureau) are not free to simply haphazardly implement actions that will impact the value of federal lands as desert tortoise habitat. Rather, the IA requires that prior to any significant change of the size or location of IMAs, LIMAs, or MUMAs

or a significant modification of management actions or activities permitted within those areas, different from those set forth in the MSHCP and existing management plans adopted by the land managers, signatories mut consider the likely effects on the habitats and Covered Species and the MSHCP Permit and report the exact nature and extent of such proposed modification.

83.    The Bureau and the FWS have not complied with the MSHCP, and thus neither have they complied with the BiOp terms and conditions.

84.    By the terms of the 1998 Las Vegas Resource Management Plan (RMP) and MSHCP, the former Gold Butte Allotment (which coincides with the Gold Butte ACEC) is closed to livestock grazing.

85.    In 2012, the Center for Biological Diversity sent a Notice of Intent to Sue for violations of the ESA related to implementation of the MSHCP because of unchecked trespass grazing within the former Gold Butte Allotment and Gold Butte ACEC. That grazing continues now, over a decade later, and continues to violate the MSHCP, BiOp, ITP, and, by extension, the ESA.  In the face of Defendants' inaction, WWP now brings this suit.

86.    Trespass grazing is causing serious habitat degradation for the desert tortoise, which, instead of being protected from the impacts of livestock grazing on the Gold Butte ACEC, is subject to heavy and unregulated grazing pressure.  This heavy grazing has caused proliferation of invasive grasses, which, in turn, caused large wildfires in 2005 that burned many acres of native vegetation. The burned acres are now largely a monoculture of red brome, an invasive grass species, which is also susceptible to future fires. As a result, very little native forage remains for native wildlife species and plant communities are not able to recover from fire or grazing. Decades of cattle trespass have contributed to decreased land and ecosystem health through direct impacts to native plant communities.

87.     The desert tortoise remains below minimum viable population density levels in the Gold Butte ACEC.

88.     Where failure of a term and condition of the BiOp and ITP occurs in this way, the effects of the action on listed species are modified and reinitiation of consultation is required.

89.     In addition, a new threat from solar development not contemplated by the MSHCP looms and undermines the important assumption of the MSHCP and BiOp that federal lands will continue to provide desert tortoise habitat.

90.     The MSHCP does not consider or provide for solar development that destroys the value of federal lands as habitat for the desert tortoise.

91.     Yet, vast swaths of federal lands in Clark County are rapidly being developed, or proposed for development, for solar electricity generation at a rapid rate. Upon information and belief, some of this development is occurring in LIMAs or MUMAs

92.     Solar developments exclude the tortoise or cause the significant degradation of lands that otherwise would serve as its habitat.

93.     The Bureau has recently approved at least four large solar developments spanning more than 13,000 acres within lands covered or partially covered by the MSHCP.

94.     More such developments are proposed. Recently, the Las Vegas Bureau published a notice of intent to prepare an Environmental Impact Statement ("EIS") and amend its Resource Management Plan ("RMP") to allow the Rough Hat Clark County Solar Project to move forward—a project that would destroy four square miles (or approximately 2400 acres) of Mojave desert tortoise habitat, and would modify the RMP to do so. At least 12 other proposed and approved solar projects would cover approximately 16,000 acres, or nearly 25 square miles of federal lands that otherwise would serve as habitat for desert tortoise. The Bureau apparently

plans to authorize these developments despite their potential to cut off desert tortoise habitat connectivity and isolate populations.

95.     Some of these solar developments encompass lands where grazing privileges were bought out by Clark County or other entities for desert tortoise conservation.

96.     Perhaps unsurprisingly, desert tortoise populations are plummeting. The species has been in long-term decline since 2001.

97.     Desert tortoise populations in all Recovery Units have declined drastically since 2004, except for the Northeastern Mojave Recovery Unit.

98.     Within the Northeastern Mojave Recovery Unity, desert tortoise populations have declined within the Gold Butte ACEC.

99.     Between 2004 and 2014, the Mojave desert tortoise's rangewide abundance fell 32 percent. By 2014, three of the five Recovery Units fell below the minimum viable population density to avoid extinction, of 3.9 adult tortoises per square kilometer. For example, Ivanpah Valley in CA and NV historically had a density of 100 tortoises/square km. This number dropped to 2.3 tortoises /km2 by 2014.  The West Mojave Recovery Unit has experienced the largest declines, measured at 50% of the tortoise population between 2004 and 2014.

100.     The tortoise's population status has not improved since 2014. Most recovery units continue to decline drastically. Recent large-scale solar project tortoise translocation efforts in the West Mojave revealed a lack of juvenile tortoises under 180 millimeters shell length, indicating a lack of survivorship and no recruitment into adulthood of the population in this region. Habitat destruction from large-scale solar projects was indicated as a major cause, including indirect effects of project development extending outwards on adjacent tortoise habitat.

## CLAIMS FOR RELIEF

## FIRST CLAIM FOR RELIEF

### Violation of the ESA: Defendants Have Failed to Reinitiate Consultation

101.    WWP realleges and incorporates by reference all preceding paragraphs.

102.    WWP challenges Defendants' failure to reinitiate consultation on the MSHCP in light of 1) continued trespass cattle grazing in the Gold Butte ACEC and Gold Butte National Monument that compromises those lands' habitat value for the desert tortoise; 2) the new threat to desert tortoise from large-scale solar development on federal lands that was not considered or anticipated by the MSHCP; 3) the dramatic population decline of the Mojave desert tortoise.

103.    An agency must reinitiate consultation whenever new information reveals effects of the action that may affect the species or its critical habitat in a manner or to an extent not previously considered, or if the action is modified in a manner that causes an effect to the species or its critical habitat in a way not considered in the consultation. 50 C.F.R. § 402.16.  These factors are satisfied because: (1) the MSHCP assumed livestock grazing would not occur in the Gold Butte ACEC but it is occurring there; (2) the MSHCP did not consider the threat from large-scale solar development on federal lands; and (3) the Mojave desert tortoise is declining. Thus, development of non-federal land and right of ways may affect the environment, and the Mojave desert tortoise, in ways that have not been considered.

104.    By failing to reinitiate consultation over the MSHCP, Defendants have violated and continue to violate the ESA and its implementing regulations, as well as the APA, and their failure to do so is not in accordance with the law. 50 C.F.R. § 402.16.  Defendants' failure to promptly reinitiate and/or request reinitiation of consultation as required by the ESA has caused or threatens serious prejudice and injury to WWP's rights and interests.

## SECOND CLAIM FOR RELIEF

**Violation of the ESA: Defendants' Reliance on the MSHCP BiOp is Unlawful.**

**105.**     WWP realleges and incorporates by reference all preceding paragraphs.

**106.**     The Bureau has not gathered and removed cattle which are grazing in trespass on the Gold Butte ACEC and Gold Butte National Monument, even though the Gold Butte ACEC is closed to livestock grazing to protect the Mojave desert tortoise and other species by the express terms of the MSHCP, and allowing Gold Butte to be grazed violates the Bureau's commitment in the IA to implement the MSHCP.

**107.**     Defendants continue to engage in and authorize activities, principally solar development, on lands covered by the MSHCP, despite new information revealing that those actions affect the Mojave desert tortoise in a manner and to an extent not previously considered, and even though the MSHCP and its FEIS does not consider the effects of solar development on federal public lands.

**108.**     By failing to comply with the BiOp, ITP and IA terms and conditions, Defendants have voided the BiOp and ITP.  Defendants are therefore liable for take caused by development on private lands in Clark County. Defendants' unlawful take has caused or threatens serious prejudice and injury to WWP's rights and interests.

**109.**     By failing to comply with the BiOp, ITP and IA terms and conditions, Defendants are placing the desert tortoise in jeopardy, in violation of the ESA. Defendants' actions causing jeopardy to the desert tortoise have caused or threaten serious prejudice and injury to WWP's rights and interests.

/ / /

### THIRD CLAIM FOR RELIEF

### Violation of NEPA: Failure to Supplement NEPA Analysis.

**110.**    WWP realleges and incorporates by reference all preceding paragraphs.

**111.**    To comply with NEPA, if a major federal action remains to occur and "[t]here are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts," an agency must supplement its NEPA analysis. 40 C.F.R. § 1502.9(d).

**112.**    Defendants FWS and Clark County must supplement the MSHCP FEIS because continued grazing in Gold Butte National Monument, new solar development federal lands that excludes desert tortoise, and the increasingly imperiled status of the desert tortoise are all significant new circumstances relevant to environmental concerns and bearing on the impacts of development of non-federal lands within Clark County.

**113.**    In addition, major federal actions remain to occur because, upon information and belief, the Bureau has not disposed of all lands anticipated to be disposed of by the MSHCP and plans to dispose of additional federal lands as contemplated by the MSHCP.  Major federal actions also remain to occur because federal agencies are carrying out the MSHCP by implementing major federal actions on federal lands, including authorizing livestock grazing, and others.

**114.**    Nevertheless, Defendants have failed to supplement the MSHCP EIS to consider this new information and these new circumstances, in violation of NEPA.  Defendants continue to fail to supplement the MSHCP EIS on an ongoing basis.

**115.**    Defendants' failure to supplement the MSHCP EIS has caused or threatens serious prejudice and injury to WWP's rights and interests.

## REQUESTS FOR RELIEF

WHEREFORE, WWP requests that this Court enter judgment providing the following relief:

**A.** Declare that Defendants have violated and are violating the ESA by failing to reinitiate consultation on the MSHCP;

**B.** Declare that Defendants have violated and are violating the ESA by relying on an invalid BiOp;

**C.** Declare that Defendants have violated and are violating the NEPA by failing to supplement the MSHCP FEIS;

**D.** Vacate the MSHCP BiOp and ITP;

**E.** Order Defendants to promptly reinitiate consultation on the MSHCP;

**F.** Order Defendants to promptly supplement the MSHCP EIS;

**G.** Enjoin Defendants from authorizing or undertaking any livestock grazing or development on the MSHCP lands until a lawful consultation is complete;

**H.** Enjoin Defendants from authorizing or undertaking any livestock grazing or development on the MSHCP lands until a supplemental NEPA analysis is complete;

**I.** Award WWP its reasonable costs, attorneys fees, and other expenses incurred to bring this action;

**J.** Grant such other relief as the Court may deem just and proper or as WWP may request.

Respectfully submitted this 14th day of September, 2023.

*/s/ David A. Bahr*
David A. Bahr (D.D.C. Bar # OR0001)
BAHR LAW OFFICES, P.C.

1035 1/2 Monroe Street
Eugene, OR  97402
(541) 556-6439
davebahr@mindspring.com

Talasi B. Brooks (ID Bar #9712)
(*pro hac vice* application pending)
Western Watersheds Project
P.O. Box 2863
Boise ID 83701
(208) 336-9077
tbrooks@westernwatersheds.org

*Attorneys for Plaintiff*